172853 Laurie Laidlow v. Fairmont Standard E. Counsel, you may proceed. Good morning. May it please the Court and Counsel, I am Charles Cohen on behalf of the Planned Parenthood petitioner, Laurie Laidlow. We're here, of course, regarding an injury to Mr. Laidlow, whose usual name is John. He suffered to his right knee at the place of employment at the Blue Lady Foods on March 23rd, 2013. There's some dispute as to whether it was the 21st or 23rd, 2013, but that is moot, as there is the question of an event having been claimed and reported at the place of employment. He was employed as a loan employee by Fairmont Staffing, and the borrowing employer at Blue Lady Foods, whose factory it took place, really has had little or no involvement in this case. Relative to our discussion is the fact that the case was tried on two different occasions, two parts before arbitration, and those would be Gary Vick's lawful nine months of trial. On February 27th, 2015, and concluding, except for opposing proofs, on November 18th, 2015, also significant is that Mr. Laidlow has righteously testified to two different events involving this injury. It took place at the Blue Lady factory. Is it your argument that the second incident, the cheese incident, caused the compensable work-related injury? Okay, well, did you ever make that argument before the commission? Yes, I believe so. Are you sure? Definitely the evidence was placed before the commission on the second event. What does the application for adjustment of claims say? What does the application for adjustment of claims say is the incident that you wish compensation for? The application only refers to the first event. First case. Did you ever amend the application for adjustment of claim? I don't think so. Next. My testimony did show two different occurrences and the chronology of the events. Let's assume that you did that, and perhaps I think the record reflects you're correct. He did testify. However, you did not include that argument in the statement of exceptions and brief you filed with the commission, nor did you argue before the commission anything about the cheese-lifting incident. So tell us why it's not forfeit. You understand you're not entitled to raise an argument for the first time on appeal that you didn't raise before the commission. You're aware of that. Yes, I'm aware of that. But the event was described in the live testimony. Wait a minute. Okay, assume it was. You never raised it in your statement of exceptions. You never put it down as the date of accident in either your original or your amended application for adjustment of claim. This issue you're raising now is being raised for the first time on appeal. Okay. Well, it's all part of the chronology of the same thing. It's not like a different date, a different occurrence. It is a different occurrence, but only a matter of minutes, not a matter of, like, the other one. Well, it becomes important because the commission found your client not credible on his claim for the first accident. He said it was they found it was impossible based upon the construction of the door. They didn't believe him. So now you lose the claim that you filed, and now on appeal you want to raise a different claim. You can't do that. The thing is this was all before the argument. I know what you're saying. Don't spend all of your time. I mean, I think you have a very substantial forfeiture argument, but there's another matter I want to ask you about. You're alleging the decision obviously was contrary to the manifest weight of the evidence, right? I'm sorry. You're alleging that the decision, the commission's decision, was contrary to the manifest weight of the evidence, correct? That is correct. Okay. What is your response to this, that the claimant's account is contradicted by the record? None of the medical records state that the claimant injured his knee while lifting blocks of cheese onto the conveyor. The medical records do not describe any twisting injury. So even though you're saying the claimant testified to it, where is the support in the medical records for that? It has to be acknowledged. He identified the striking of the door as an injury. He felt the sting there, and apparently he tried to go to work with some degree of discomfort, and then as he lifted the cheeses, he got real mad. But what about if the commission doesn't believe him because there's no supporting evidence of that? What if they don't believe him? The only factor, evidentiary factor, which caused the arbitrator to reject his testimony was the physical appearance of the door. It's shown in photographs that were testified to by Margarita Mercado, the personnel manager for Paramount staff. Not for Little Lady. It's Little Lady's door, Little Lady's factory, Little Lady's fixture, but nobody from Little Lady came about. It was Paramount's personnel manager who testified, not when she first testified on day one, but on day two when she had even less recollection, she suddenly comes in with these photographs and says, this is what the door looked like on the day of the occurrence, which I doubt she really investigated, and then it was in the same condition on the day when she was specifically asked, when did you take these photographs? She didn't have any recollection whatsoever, so the question comes up in our mind, did she take the photographs sometime close in time to when the event took place, or did she take those photographs sometime between hearing day one and hearing day two? Given her lack of recollection as to just about everything else, we consider that her testimony was somewhat, I don't know, helped, coached, I don't know, with regard to these photographs, because I don't think she really had any personal knowledge about the door, how it worked on the day, how it was. Hang on a second. You raise a legitimate point. During the February 2015 arbitration hearing, I'm assuming you were there, right? My partner was at these hearings. I was not. Well, you were aware of the transcript. You're familiar with the evidence, right? I knew the transcript. Didn't Marcato testify then that while the claimant reported, that after the claimant reported the alleged incident, she investigated the door in question. She inspected it. She didn't see any visible defects in the door. She stated the door will not open unless it is buzzed and unlocked from the inside. Didn't she testify she actually inspected the door? I actually, she, this was on the first day of the testimony. Now, I wouldn't know that you would show it better than I did, but that's, but the evidence shows. I recall this only being from the latter day of testimony, and the problem is there's really no records from the day of the occurrence. She testified also on the first day of testimony that she took some kind of a statement that was emailed to Paramount staffing. Mr. Cohen, Mr. Cohen, you told us she did not examine the door. You told us she didn't examine the door. The record reflects she testified she did. You owe this court candor, and if you don't argue the record candidly, I, for one, would terminate your oral argument and tell you to sit down. I, it's not under the impression that she did undertake the occurrence. I don't know when she. February 2015 arbitration hearing. That's when she testified she inspected the door. All right. Did she, all right. You needed to review before you argued, you should have reviewed the transcripts, but go on. All right. Well, at any rate, the issues with regard to the photographs, she had no recollection of when she took those photographs, and now she examined the door. It had an automatic door closer. This guy testified it moved quickly. The arbitrator concluded merely from the fact that the photograph showed this door closer that it couldn't have happened the way he said it happened. But the thing is, we don't even know, and I don't. All right. I was apparently mistaken that she inspected the door. What did she, did she know whether the door closer was there, whether it worked? She knows there's a door, and she knows he has a door. Well, what does her testimony say? Let's forget the photographs. What does her testimony say about the door? The testimony, the guy's testimony was it moved quickly forward toward someone else was coming, was moving through the door, and it moved back toward him, and he struck the knee on the door. That was the live testimony of the gentleman, was that he struck his knee and it moved quickly into his direction, this door. That's what he testified as to what happened. But the inference, and I only can say it's an inference, is that if there was a door closer on the door at the time, it wasn't working right because I know what those things are. After all, they're supposed to slow down the motion of the door, and it didn't. And we, I have no reason to believe that. And so the testimony of, it's Mercado, right? Mercado. I'm sorry. The testimony of Mercado was that she inspected the door the date of the accident? All right, that's my understanding, yes. Okay. I don't know how well she inspected it. She knew what she was looking for. Does she know what an automated door closer is, how it's supposed to work? Did anyone ask her those questions on cross-examination? Yes, sir. What was asked of her is when did you take these photographs? And the photographs were the key to arbitrator Andros' ruling. He said there's an automated door closer on the door, therefore it could have happened before he said he saw the photograph. The fact she didn't even remember when, she didn't have much recollection, really. Mr. Cohen, just to satisfy your curiosity, Mercado testified that when she inspected the door after the claimant reported the incident, she opened and closed the door to see if anything was wrong. She found that the door closed by itself. She found there was nothing out of place. Everything was fine. So she did a physical examination and inspection of the door herself. All right. Okay? Okay. I'll put that to rest. Okay. Because I was more focused on the second date. I understand. Where recollection was weaker except for the subtle appearance of these photographs, which we didn't understand why they weren't presented on the first date of testimony. And she couldn't even recall when she was asked, when did you take these pictures? And she had no idea. And that was where we felt this photograph, which was the key to the arbitrator's finding. It may have been absent her physical inspection and testimony. I understand. No, I understand that. We focused on the letterhead and we adapted to this movement. And there was a mistake. Can you explain to me how the door worked? I'm sorry? Can you explain to me how the door worked? The door, it was my understanding that it was coming forward toward him. Someone else's head was going out. And all I can know about how the door worked, it was from his own live testimony. His testimony did not seem consistent with there being a functioning automatic door closer on this door. That's all I can say. His testimony about fastening the door, if there was an automatic door closer. And the only other thing I can say is someone else may have pushed the door hard because apparently someone was coming out as he was coming up to the door. Well, I don't see anybody arguing this, but just logic tells me that we don't care about the automatic door closure. The testimony was that you go up, you press a buzzer, and the person, security person, verifies that you're appropriately, it's appropriate for you to come in because there's a dedicated exit at this place. There's no discussion in the live testimony regarding a buzzer or something buzzing in. Apparently people were coming in and out of the door simultaneously. Apparently this must have been at or near the beginning of the shift. And there's a lot of people going in and out the door. So this buzzer thing is kind of not a particularly relevant point to the operation of the door. But at the instance that Mr. Blaymore was going in and out. Mr. Cohen, if I could ask you to sum up in so many words. Why is the decision of the commission against the manifest way to the evidence? Why is the commission's decision against the manifest way to the evidence? Just to summarize and tell us succinctly why that is. Well, because the guy testified, the general testified, as to how the door functioned when he came in. And there's no evidence of a functional, in the way the door behaved, of a functioning automatic door. So you're telling us in his testimony the door malfunctioned, the door didn't function properly, based on his experience that day, right? In so many words, is that what he said? Yeah, well, he thought it was functioning improperly. Right, okay. And Mercado was not there at the time. She may have looked at the door later, whether she knew what she was looking for. While, yes, she did, and I'm mistaken to the extent that I missed it, on the early day testimony, the guy that was in front of the inspection, the fact is that what was key to arbitrator Andros' mind on this was the photographs and the automatic door closures. Because the mere fact that he was there in that picture, and I don't, she has no expertise on doors. She's a personnel manager. Wait a minute, hold on a second. Mr. Cohn, please. We're not idiots. Oh. She testified that the picture she took accurately represented the condition of the door on the day she first saw it. Are you telling me that you have to be an expert to know what a door closer looks like? Does she even know if it worked or not? She did test, excuse me. She testified that when she examined that door, after he reported the incident to her, she opened and closed the door to see if anything was wrong. She found that the door closed by itself and, quote, there was nothing out of place and everything was fine. That was her testimony. She said the way it worked, by the way, is she did testify that there was a buzzer and then the door was pulled open and unless someone was coming through the door from the other side, it wouldn't open without being buzzed. She testified to that the first time. If someone was coming through the door, I believe from a live testimony, Mr. Laidlaw, as he was coming in. Someone was coming. That's why the door was coming toward him. Someone was coming out, and that's why he was coming toward him. You'll have time in reply if I've been certified. Thank you. Counsel, you may proceed. Good morning, Your Honors. May it please the Court. Counsel, my name is Thomas Boyd. I represent the Affiliate of O'Leary Foods and Paranormal Staffing. I would ask that this Court affirm my full decision with the arbitrator, which was affirmed in the Ops Dividing Commission, and Mr. Laidlaw to walk over to the Circuit Court. As our interviewer found, there was simply not sufficient evidence to the other one. He basically said, hey, there's a door that we know the employee probably corroborated by testimony. We know that there was maybe an injury at home, according to medical records from a data service of April 12, 2013, from Vista Medical Center that alleged there was an injury at home. We know that there is a second injury theory later on in the day, well, lifting cheese. That evidence, whether it's seen as negligence or not, is not what you're here to do. You're here to see if the decision made by Rep. Ambrose was made on insufficient evidence. Well, let's pin down that last point, because I think it is critical here. Apparently, the claimant did testify about both incidents during the arbitration hearing. It's my understanding he never argued before the Commission that the cheese-lifting incident in any way caused or contributed to his injury, did he? I believe that in the transcript he does allege there's a twisting mechanism. I know that, but did he make that argument, did he have a statement of exceptions on that, and did he make that argument to the Commission? No, sir. So why is it a forfeit? I believe it's very simply for that exact thing. It wasn't mentioned at all in the case. If I can hop back real quickly. There was sufficient testimony regarding the day of injury. He was certain that he got it Thursday, March 21st, because he went to church with his wife on a Monday when he was tired. Well, eventually, it's even stipulated by counsel in his briefs that the injury was on the 23rd, alleged injury, which is also corroborated by the time cards, if you look. He worked a full day on the 21st, worked about 90 minutes on the 23rd. So if there was an injury, it looks like it's the 23rd. I think that's been stipulated by counsel. That's a credibility issue. But, again, it's not your judgment today. Well, we don't have an answer. It's your job. We're here to see if the evidence was sufficient to arrive at the conclusion of arbitration that goes with that claim. I really don't have a whole lot to discuss. What did she say in testimony? Let's forget the photograph. Sure. She testified that the door, to her knowledge, had not been altered or modified or repaired in any way since the day of the accident. She had not had any report of the door being malfunctioning on the day prior. And what do we mean by malfunctioning? There was no report of the door swooning wildly open or shrugging uncontrollably. There was no report of any prior incidents. Counsel, I think, is misstating. He basically infers that it's our burden to show the door was working properly before we asked it. Well, I'm just trying to give you the record. Sure. If you can direct me to a certificate for that. So an apposite conclusion is not clearly apparent. She says the door was fine. He said it was malfunctioning. Commission makes the call, right? Exactly. And, again, the deference here to your previous decision is high in the circumstances when it's just a question of fact and a plot. And so, really, I think the appeal is ill-taken. Counsel, I don't think that we can avoid the door on the original. He brought the credibility of the petitioner, Mr. Blago, into question. He said basically the only piece of evidence supporting a finding of no accident is this door swoon. Well, again, we discussed that the accident date was nebulous. He was certain that the accident happened on Thursday. He went into great detail in his testimony. That's very handsome. And as you guys, excuse me, as your Honors, as your Honors indicated earlier, there was no alleged mechanism of injury following the initially alleged door swoon. There was no mention in the application or in any application that the injury occurred while lifting sheets. So I think for that reason, we find, or your Honor, you find that Dr. Andrews' decision was not against it. What about the claimant's argument that your brief should be stricken? I was honestly unclear as to that argument. I believe it was over a format issue with the color of the page. Oh, it's more than formatting. Okay. No, I think you need to enlighten yourself as to the rules for citation to the record. Okay. Do you realize the consequence of not following those rules? Okay. Okay. I think you're done. Reply. I'll be brief about this. Mr. Boyle mentioned something about an injury at home, and that came up from the VISTA medical record, which is Iron Trigger Antidotes acknowledge the one instance where there's some indication of an injury at home striking a wall. He acknowledged it was inconsistent with all other medical in the record. And, in fact, not only is it inconsistent with all medical work in the record, it's inconsistent with medical from the same day of treatment. The final day of treatment refers in the final report in that record to indication trauma to the knee one month ago. It withdrew. Now, it doesn't say where it withdrew, but I think that's good enough to show the same description of occurrence on the day of the visit to VISTA in April that is consistent with everything else that Mr. Little said to other providers in his live testimony here. Now, of course, going back to the door itself, you talked about the presence of this automatic door closer. And it was just a kind of automatic conclusion. Why do we call it an automatic door closure when it seems to me that the mechanism of injury is a door opening? And we talked about automatic door openers. It wasn't while the door was closing, was it? No, no. But what it is is that it was when the door was opening. He hit it when someone apparently was coming toward him, apparently it was someone else. And all those things have a hydraulic, if they were, right, that slows down the function of the door opening and closing. I mean, I'm talking as a layperson about how these devices work. But the whole point is I don't think the presence of this device means he didn't strike his knee on the door. There is really no evidence that he didn't strike his knee on the door. But the commission has to believe them, don't they? Don't they? Aren't they still entitled to judge the credibility and believability of the claimant? I'm sorry? Isn't the commission entitled to judge the credibility and believability of the claimant? He testified clearly he hit his knee in his version. What if they didn't believe him? Do they have to believe him? No, they don't have to believe him. That's true. But there's two bases in the record for not believing him. One is this device on the door. That was when Arthur Prager and those publicans ruled it on. And the fact that there was one out of many items that was inconsistent with his story in the medical record. I don't even think he relied upon that because he commented specifically about the inconsistency of the single notation. He hit his knee on a wall at home. This doesn't sound like very sensible chronology anyway. But the same hospital visits also doesn't mention the door event. So what I'm saying is, all right, if you do not believe Mr. Blayhill, put something in the medical record. And why he isn't believable, the presence of the door-closing device in and of itself doesn't mean he hit his knee in a different way than he says or not at work. The mere presence can mean more. And that's, I think, important. If you're going to say Mr. Blayhill is a liar and he's not credible, put it in the ruling. Why? Other than the fact that there's a device on the door that means the door is doing work the way he said, that he didn't come at him fast. Now, the son-in-law's pushing the door from the other side. He couldn't come at him with a door-closing device on it or not. So that, I don't think, is the basis to say that Mr. Blayhill isn't true. And I don't think there's anything in the medical records either that says Mr. Blayhill isn't telling the truth. I think, on the whole, there's nothing in this record that says Mr. Blayhill is doing something. May I ask a question? Oh, certainly. Please. Thank you. Thank you. So, counsel, what's going on? You have a question. A quick follow-up question, I'm sorry. With regard to the mechanism of the door, what I agree from the record is that the fact that the door screen both out and in was mechanized and essentially slowed down, I agree from the record that the arbitrator, that affected the credibility of the claimant because there was this testimony that the door had swung open and struck and pinned the claimant. Do you have any response? Well, this testimony was, at the time, and that's why this other case is important. People were going in and out. Apparently, this was retribution. He was underworking. It's underprivileged. He was working. And so, the fact that there was a door-closing mechanism, whether they were working or not working, doesn't mean that it's not possible. The door swung in. So, that's why I think there is nothing in this record or in the rest of it, you know, that suggests he wasn't honest. Thank you. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement. A written disposition will issue.